UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
SHARIFUL MINTU,                                :     **MEMORANDUM OPINION**
                 Petitioner,     :     **AND ORDER**
v.                                             :
                                          :     17 CV 2565 (VB)
UNITED STATES OF AMERICA,                      :     16 CR 204 (VB)
                 Respondent.    :
--------------------------------------------------------------x

Briccetti, J.:

       Petitioner Shariful Mintu, proceeding pro se, moves under 28 U.S.C. § 2255 seeking to vacate, set aside or correct his sentence, arguing that his counsel was ineffective because:

       1. Counsel did not show him discovery;

       2. Counsel did not show him his presentence report in a timely fashion;

       3. Counsel pressured him to plead guilty to a crime of which he was not guilty, and "just stood there" when the prosecutor threatened to "[go] after" his family unless he pleaded guilty; and

       4. Counsel failed to advise him of the immigration consequences of his guilty plea.

       For the following reasons, the motion is DENIED and the petition is DISMISSED.

## BACKGROUND

       The motion, the government's papers in opposition, Mintu's "traverse" to the government's submission, and Mintu's supplemental brief in support of his motion, as well as the record of the underlying criminal proceedings, reflect the following.

       Mintu was initially charged in a criminal complaint, filed July 30, 2015, with conspiracy to commit bank fraud and money laundering. The complaint detailed Mintu's alleged involvement in numerous bank and credit card fraud schemes over an eight year period. (Gov't Mem. Ex. A).

1

After extensive plea negotiations, which included five separate meetings between Mintu, his counsel, the prosecutor, and other law enforcement personnel (Gov't Mem. Ex. G), Mintu agreed to waive indictment and plead guilty to a one count felony information charging him with participating in a conspiracy to commit bank fraud, whereby the conspirators fraudulently obtained loans and lines of credit from banks and other lending institutions by, among other things, falsely claiming that the loan proceeds would be used to purchase automobiles, when in fact the automobiles were not purchased and the loan proceeds were instead distributed to members of the conspiracy or to entities they controlled. Specifically, the information charged Mintu with helping to arrange a fraudulent car loan in October 2012. (Gov't Mem. Ex. B). During the five meetings that preceded the guilty plea, the government discussed with Mintu and his attorney the evidence relating to the various fraud and money laundering schemes alleged in the complaint, and showed Mintu and his attorney numerous documents relating thereto. Among other things, the government showed Mintu and his attorney evidence related to the specific fraud scheme charged in the information to which he ultimately pleaded guilty. (Gov't Mem. Ex. G).

On March 28, 2016, pursuant to a written plea agreement, Mintu pleaded guilty to the one count information. The plea agreement contained a Guidelines stipulation that the applicable sentencing range was 15-21 months' imprisonment, as well as a waiver of Mintu's right to appeal or otherwise challenge his sentence so long as the Court sentenced him to 21 months' imprisonment or less. (Gov't Mem. Ex. C, at 3-4).

This Court conducted the plea allocation. Among other things, Mintu confirmed under oath that he (i) understood the proceedings; (ii) had had enough time to discuss the case with his attorney, including the consequences of his guilty plea; (iii) was satisfied with his attorney's

representation; (iv) understood the constitutional rights he was waiving as part of his guilty plea; (v) understood the charges and the maximum possible punishments he faced; and (vi) understood that once he pleaded guilty, he would not be allowed to withdraw that plea, even if the sentence ultimately imposed was different from that contemplated by the plea agreement, or different from what his attorney or anyone else told him it might be, or different from what he expected it to be. (Gov't Mem. Ex. D, at 6-15, 21-22).

In addition, Mintu confirmed that no one had threatened him or coerced him in any way or tried to force him to plead guilty or to enter into the plea agreement. (Gov't Mem. Ex. D, at 22-24).

Regarding the immigration consequences of his guilty plea, Mintu confirmed he understood that because he was not a United States citizen there was a strong possibility he would be deported after serving his sentence, and that his attorney had advised him of the immigration consequences of his plea. (Gov't Mem. Ex. D, 15-16, 19-20). Indeed, the plea agreement explicitly provided that Mintu recognized his guilty plea and conviction made it "very likely that his deportation from the United States is presumptively mandatory and that, at a minimum, he is at risk of being deported or suffering other adverse immigration consequences." The agreement further provided that Mintu acknowledged he had discussed with his counsel "the possible immigration consequences (including deportation) of his guilty plea and conviction," and that Mintu "affirms that he wants to plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction, even if those consequences include deportation." (Gov't Mem. Ex. C, at 4-5). Mintu confirmed he had read, understood, and discussed every aspect of the plea agreement with his attorney before he signed the agreement.

(Gov't Mem. Ex. D, at 22-23). Also, defense counsel stated he had "fully" advised Mintu about the immigration consequences of the plea. (Gov't Mem. Ex. D, at 19).

Mintu then admitted to the crime charged, and made a sufficient statement on the record to establish a factual predicate for the plea.

Specifically, Mintu admitted he had participated in the bank fraud conspiracy by helping to set up bank accounts in his name and a relative's name for the purpose of enabling a co-conspirator (Baldev Tal) and others to obtain fraudulent loans. Mintu further admitted that during the course of the bank fraud conspiracy, he enlisted Tal to prepare fraudulent paperwork for a $98,000 car loan to be obtained by Mintu's brother-in-law, and that Mintu knew the car loan was fraudulent because there was no car being purchased and because most of the proceeds would be used to pay off the brother-in-law's credit card debt. Mintu also admitted that when his brother-in-law complained he had not received the balance of the fraudulently-obtained loan proceeds from Tal, Mintu got a few thousand dollars from Tal and gave it to the brother-in-law. (Gov't Mem. Ex. D, at 31-33, 39-56).

Finally, Mintu confirmed he was pleading guilty voluntarily and of his own free will, and was guilty as charged. (Gov't Mem. Ex. D, at 56).

Following this allocution, the Court found that Mintu's guilty plea was knowing and voluntary and was "supported by an independent factual basis for each and every element of the crime charged." (Gov't Mem. Ex. D, at 56-57).

At sentencing on July 7, 2016, both Mintu and his attorney confirmed they had read the presentence report ("PSR") prepared by the Probation Department, and Mintu further confirmed he had discussed the PSR with his attorney. (Gov't Mem. Ex. E, at 6). After both the government and Mintu acknowledged there were no objections to the factual statements in the

4

PSR, the Court adopted the factual statements in the PSR as the Court's own findings of fact for purposes of sentencing. (Gov't Mem. Ex. E, at 7-8, 11). Those facts were consistent with Mintu's plea allocution described above. The Court then adopted the Guidelines calculation set forth in the PSR (15-21 months' imprisonment) and, after hearing from both counsel and Mintu himself, carefully evaluated all of the sentencing factors set forth in 18 U.S.C. § 3553(a). Finally, the Court imposed a sentence below the bottom of the range – one year and one day of imprisonment – to be followed by two years of supervised release. (Gov't Mem. Ex. E, at 11-38).

Mintu did not appeal his sentence.

On April 10, 2017, Mintu timely filed the instant 2255 motion, arguing his counsel was ineffective because he did not show Mintu any discovery; did not show Mintu the presentence report in a timely fashion; and "just stood there" when the prosecutor threatened to "[go] after" Mintu's family unless he pleaded guilty. After the government filed its opposition, Mintu filed a "traverse," in which he raised for the first time a claim that defense counsel was ineffective because he failed to advise Mintu of the immigration consequences of the guilty plea. Thereafter, without leave of the Court, Mintu filed a "supplemental brief" in further support of his motion, in which he raised yet another new claim, namely that his attorney pressured him to plead guilty to a crime he did not commit.

## DISCUSSION

Based on the record already before the Court and the Court's familiarity with the underlying criminal proceedings, Mintu's claims are entirely without merit and must be denied without a further hearing. Specifically, the Court finds that defense counsel provided constitutionally effective representation.

5

First, "counsel's representation [did not fall] below an objective standard of reasonableness," United States v. Hernandez, 242 F.3d 110, 112 (2d Cir. 2001), the first prong of the familiar ineffectiveness of counsel standard under Strickland v. Washington, 466 U.S. 668, 687 (1984). The claim that counsel was ineffective because he did not show Mintu any discovery is plainly frivolous. The government did not make a formal production of discovery because Mintu waived indictment and pleaded guilty to an information after negotiating a guilty plea in the several month period after being charged in a complaint.[1] Moreover, despite filing both a "traverse" and a "supplemental brief," Mintu does not dispute the government's representation that during five meetings with Mintu and his counsel, the government discussed the evidence in detail and showed him numerous documents relating to the various fraud schemes charged in the complaint, and also showed him the evidence relating to the $98,000 fraudulent bank loan scheme charged in the information. Moreover, in his plea allocution, Mintu confirmed he had had enough time to discuss the case with his attorney, including the consequences of pleading guilty, and that he was satisfied with counsel's representation.

The claim that counsel did not show Mintu the PSR in a timely fashion is equally frivolous. Mintu claims, confusingly, that "my attorney read me my PSI report before I was walking into court for my plea agreement. He never gave me a copy of the report. Just read it to me 5 minute before I walked into the Court." (Motion, at 5). Since the PSR was prepared after the guilty plea, Mintu must mean by this that his attorney only showed him the report a few minutes before sentencing. But at sentencing, Mintu explicitly confirmed he had read the PSR and discussed it with his attorney, and defense counsel stated he had read the report and

---

[1] At the arraignment on March 16, 2016, the government advised the magistrate judge that it did not anticipate making discovery in the case because the parties would shortly be scheduling a guilty plea. (Gov't Mem. Ex. H, at 7-8). In fact, Mintu pleaded guilty less than two weeks later on March 28, 2016. (Gov't Mem. Ex. D).

6

discussed it with Mintu. (Gov't Mem. Ex. E, at 6). At no point during the sentencing, including when Mintu addressed the Court, did Mintu suggest that he had not had enough time to review the report. Mintu did complain about being taken advantage of by his friends, but did not complain about his attorney. (Gov't Mem. Ex. E, at 23-27).

Moreover, the claim that defense counsel pressured Mintu to plead guilty to a crime of which he was not guilty, and "just stood there" when the prosecutor threatened his family unless he pleaded guilty, is completely belied by the record in this case, as well by common sense. Mintu stated under oath during his plea allocution that (i) no one had threatened him or coerced him or tried to force him to plead guilty or to enter into the plea agreement; (ii) before he signed the plea agreement, he had read and understood it, and had discussed every aspect of the plea agreement with his attorney; (iii) he had had enough time to discuss the case with his attorney, including the consequences of his guilty plea, and was satisfied with his attorney's representation; and (iv) he was in fact guilty as charged and was pleading guilty voluntarily and of his own free will. Finally, in his own words, Mintu explained what he did that made him guilty of the offense: that he had set up bank accounts for the purpose of enabling others to obtain fraudulent loans; that he had enlisted Baldev Tal to prepare fraudulent paperwork for a $98,000 car loan to be obtained by Mintu's brother-in-law; that he knew the car loan was fraudulent because there was no car being purchased and because most of the proceeds would be used to pay off the brother-in-law's credit card debt; and that he personally provided a portion of the proceeds to his brother-in-law.

In short, the evidence is overwhelming that Mintu was not forced by anyone – either his lawyer or the prosecutor – to plead guilty to an offense he did not commit, and there is no credible evidence whatsoever that Mintu's lawyer somehow allowed the prosecutor to threaten or

7

force him to plead guilty. Mintu's bald and self-serving allegations to the contrary are rejected as complete fabrications.[2]

Finally, Mintu's claim that his attorney failed to advise him of the immigration consequences of his guilty plea is likewise completely belied by the record. Mintu stated under oath during his plea allocution that he understood there was a strong possibility he would be deported after serving his sentence, and that his attorney had advised him of the immigration consequences of his plea. Indeed, the plea agreement signed by Mintu explicitly provided that Mintu recognized his guilty plea and conviction made it "very likely that his deportation from the United States is presumptively mandatory and that, at a minimum, he is at risk of being deported or suffering other adverse immigration consequences." The agreement further provided that Mintu acknowledged he had discussed with his counsel "the possible immigration consequences (including deportation) of his guilty plea and conviction," and that Mintu "affirms that he wants to plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction, even if those consequences include deportation." Mintu confirmed that before he signed the agreement, he had read and understood it, and had discussed every aspect of the agreement with his attorney. Also, defense counsel stated he had "fully" advised Mintu about the immigration consequences of the plea. Therefore, the Court rejects as

---

[2] The government's lead investigator submitted an affirmation stating, among other things, that he was present for the five meetings between the government and Mintu and Mintu's counsel prior to the guilty plea; at the guilty plea itself; and during a conversation between the prosecutor, Mintu, and Mintu's counsel in the hallway outside the courtroom just prior to the plea. According to the investigator, at no point during any of these meetings or conversations did the prosecutor threaten or coerce Mintu or Mintu's family members or anyone else. (Gov't Mem. Ex. G). The investigator's sworn representations are consistent with Mintu's sworn representations during the plea allocution, and provide further support for the Court's conclusion that Mintu's claim that he was coerced into pleading guilty by the prosecutor's threats, or that his counsel "just stood there" when the prosecutor made threats against Mintu's family, is a complete fabrication.

frivolous Mintu's claim that defense counsel failed to advise him of the immigration consequences of his plea.

Moreover, although the Court need not reach the question of whether Mintu demonstrated "actual prejudice," the second prong under <u>Strickland</u> – meaning "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial," <u>United States v. Hernandez</u>, 242 F.3d at 112 – the record reflects that Mintu was not prejudiced by his attorney's conduct in this case. Mintu's allocution under oath during the plea proceeding demonstrates that he was advised of and understood the charges against him and the consequences of pleading guilty, including the adverse immigration consequences, and that he was guilty as charged. In addition, defense counsel obtained a highly favorable plea deal that reduced Mintu's sentencing exposure from the multiple fraudulent schemes and money laundering activities alleged in the complaint to the one scheme charged in the information. In short, Mintu cannot establish a reasonable probability that but for counsel's alleged failures, he would not have pleaded guilty and instead would have taken the case to trial. Such a move would have been most unlikely given the strength of the proof and the favorable plea deal negotiated by Mintu's attorney. As such, Mintu cannot establish actual prejudice.

Finally, there is no reason to hold any further hearing in this case. In light of this Court's intimate familiarity with the underlying criminal proceedings, including the guilty plea proceeding and the sentencing hearing, and the fact that Mintu's "highly self-serving and improbable assertions" are flatly contradicted by documentary evidence and the record already before the Court, no purpose would be served by expanding the record. <u>Chang v. United States</u>, 250 F.3d 79, 86 (2d Cir. 2001); <u>see</u> <u>Raysor v. United States</u>, 647 F.3d 491, 494 (2d Cir. 2011).

## CONCLUSION

Petitioner Shariful Mintu's motion under 28 U.S.C. § 2255 is DENIED and the petition is DISMISSED.

The Clerk is instructed to close case no. 17 CV 2565.

The Clerk is also instructed to mail a copy of this memorandum opinion and order to petitioner at the address on the docket in case no. 17 CV 2565.

As petitioner has not made a "substantial showing of the denial of a constitutional right," a certificate of appealability will not issue. 28 U.S.C. § 2253(c)(2).

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v United States, 369 U.S. 438, 444-45 (1962).

Dated: March 26, 2018
White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge